HARRY A. KIRK, Administrator, v. METROPOLITAN LIFE INSURANCE COMPANY, Appellant.—81 S. W. (2d) 333.

Division Two, March 30, 1935.

*William C. Michaels* for appellant; *Landis & Landis, Meservey, Michaels, Blackmar, Newkirk & Eager* and *Leroy A. Lincoln* of counsel.

*Geo. E. Woodruff* for respondent.

COOLEY, C.—Action at law, in three counts, upon three industrial insurance policies, issued by defendant on the life of Belvia Kirk, now deceased. Verdict and judgment for plaintiff on each count, aggregating $816. An appeal was granted defendant to the Kansas City Court of Appeals, where the judgment was affirmed. [Kirk v. Met. Life Ins. Co., 72 S. W. (2d) 185.] That court, deeming its opinion in conflict with that of the St. Louis Court of Appeals in Gallop v. Royal Neighbors of America, 167 Mo. App. 85, 150 S. W. 1118, certified the cause to this court; hence our jurisdiction. Both parties have filed in this court additional briefs, which to some extent modify certain contentions made in the Court of Appeals, especially on the part of appellant. . Except as to contentions made in the Court of Appeals and now abandoned by appellant, we have considered the briefs filed in both courts, as counsel for both parties requested. In this court appellant has made a statement of the facts which respondent admits to be in the main correct, and which, with the elision of references to pages of the abstract and matter in the nature of comments, we quote, without enclosing in quotation marks, as follows:

The person named in the policies as the "insured" is Belvia Kirk. Her age was twenty-three. It appears that she signed three applications for the three policies and the pleadings mention such applications and certain alleged representations made therein, but the applications were not offered in evidence and their contents are not before the court. It also appears from the record that there was no medical examination and, so far as the record shows, there was no recommendation of the risk. The applications were taken July 7, 1923. On those applications, signed by the insured, three policies were issued. Each of the policies bears the date of July 23, 1923. Belvia Kirk died December 11, 1923, of tuberculosis, which was less than five months after the date of the policies.

Each of the policies contained as its first "condition" the following

clause known in the books as the "sound health" provision or condition:

"No obligation shall be assumed by the Company prior to the date hereof nor unless on said date the insured is alive and in sound health. Should the proposed insured not be alive or not be in sound health on the date hereof, any amount paid to the Company as premiums hereon shall be returned."

Another "condition" in each of the policies concerned proofs of death:

"Proofs of death under this policy shall be made upon blanks to be furnished by the company and shall contain answers to each question propounded to the claimant, physicians and other persons, and shall contain the record, evidence and verdict of the coroner's inquest, if any be held. All the contents of such proofs of death shall be evidence of the facts therein stated in behalf of, but not against the Company."

The opening part of each of the policies reads:

"METROPOLITAN LIFE INSURANCE COMPANY. In Consideration . . . doth hereby agree, subject to the conditions below and on page 2 hereof, each of which is hereby made a condition of this contract and contracted by the insured and every person entitled to claim hereunder to be a part hereof, to pay upon receipt of proofs of the death of the insured made in the manner, to the extent and upon the blanks required herein . . . the amount stipulated . . . to the executor or administrator of the insured, unless payment be made under the provisions of the next succeeding paragraph."

"The next succeeding paragraph" on the face of each policy is what is known as the "facility of payment" clause. It provides:

"The Company may make any payment or grant any nonforfeiture privilege provided herein to the insured, husband or wife, or any relative by blood or connection by marriage of the insured, or to any other person appearing to said Company to be equitably entitled to the same by reason of having incurred expense on behalf of the insured, or for his or her burial; and the production of a receipt signed by either of said persons, or of other proof of such payment or grant of such privilege to either of them, shall be conclusive evidence that all claims under this policy have been satisfied."

Plaintiff offered no evidence in chief. After the jury was sworn, plaintiff said he would "rest our case on the record and admission in the pleadings." Whereupon the defendant filed its demurrer and asked the court to direct a verdict for the defendant. This was argued and overruled. Defendant thereupon offered the three policies in evidence, the deposition of one Wells, showing tender of premiums to Mrs. Mattie C. Kirk and Mrs. McDonald (mother-in-law and sister-in-law of insured and who had paid the premiums and

had made claims on the policies). The records of the circuit court showing deposit with the clerk of the premiums paid on all three policies were admitted in evidence. Defendant then offered in evidence sworn proofs of death submitted to defendant; these proofs consisted of sworn statements of the claimants, Mattie C. Kirk and Mrs. McDonald, together with the sworn statements (part of the proofs) of Dr. G. D. Harris, Dr. Wright and Dr. Berkenmayer, attending physicians. These proofs were admitted in evidence. Defendant then read the deposition of Dr. Norman Keith of the Mayo Clinic and also the deposition of Dr. Berkenmayer of Denver; it then proved that the deposited premiums were still in the clerk's hands; and then rested its defense.

The sworn statements of claimants in the proofs showed that insured died of tuberculosis in Denver, Colorado, December 11, 1923, and that her last illness began "5 months" before; Dr. Harris stated in his part of the proofs that from "personal knowledge" deceased had had tuberculosis for one year. Further reference to the proofs and depositions will be made in this statement.

Plaintiff did not demur to the defendant's evidence or ask for a directed verdict, but proceeded to offer oral evidence in an attempt to rebut or explain the effect of the admissions contained in the proofs. Defendant contends that such admissions were in no sense explained or rebutted and that no evidence was offered in rebuttal to show that Belvia Kirk was in sound health on July 23, 1923, or even that she appeared to be in sound health on that day; that the most that can be said of the rebuttal evidence is that Belvia Kirk appeared "all right" on July 7th; that such rebuttal testimony does not in any way rebut the admissions in the proofs that insured had tuberculosis on July 23, 1923.

Plaintiff called only three witnesses, Harry Kirk, Mrs. McDonald and Mrs. Kirk. Harry Kirk, husband of insured and plaintiff in this case, was first called in rebuttal, and he testified that his wife died of tuberculosis in Denver, December 11, 1923; that he didn't know that his wife had tuberculosis "until I taken her to Mayo's, in August, 1923, I believe" (this was about a month after the date of the policies); and he said that he had lived with deceased for three years before her death and that so far as he knew she had never been treated for tuberculosis before the trip to Mayo Clinic; that his wife went to Dr. Wright, Dr. Moore, Dr. Harris and Dr. Duffy during the three years prior to her death; that these men were treating her for abdominal trouble.

Mrs. Bertha McDonald was next called in rebuttal. She was a sister-in-law of the insured (sister of the plaintiff). It appears from her testimony that a Mr. Bosanka was one of the local agents and collectors for defendant company in Trenton, and that it was he who obtained the applications for the policies in suit. It also

appears that Bosanka had quit the employment of the company. He was not a witness in the case and his whereabouts were not accounted for by either side at the trial. Mrs. McDonald held policies of her own in defendant company and Bosanka collected premiums from her. She testified that one day while Bosanka was collecting some premiums from her he "asked me if he couldn't write a policy on my sister-in-law" (Belvia Kirk), and Bosanka said, "Well, I just came from your mother's (Mrs. Mattie Kirk) and I asked her to take one out and she said she didn't know, she had quite a few in the company, she didn't think she was able to take any more out, so he kept on insisting on me, and so he said well let me write you up a $500 policy anyway and he just kept on and finally I told him he could. And so after he wrote the policy up (this evidently means application and not policy) that is the paper he told me, he says well I have to see Belvia first, and he says soon as I see her I will send the papers up and so I was on my porch three or four days after that and he passed the house in that neighborhood, I suppose collecting, and he said well I tell you don't you know I never sent those papers in yet. I says that so, he says, no, I never have got to see Belvia, and he went on and when he came back to collect on mine he said well, I finally got to see Belvia, and he says I sent the papers and I never seen him any more until the first time he came, a month until I got the policy I guess, and he brought the policy . . . and gave them to me." "Q. By policy you mean two of these policies, one for $306 and one for $204? A. Yes, sir. . . . I kept them right in my house . . . until after Belvia died. . . . It was twenty-five cents a week and he collected of me every two weeks." Mrs. McDonald said that Mr. Bosanka was well acquainted with Belvia Kirk. "He seen her at my mother's house all the time, they used to stay there. . . . He knew I was a sister-in-law of Belvia Kirk." She was asked, "What was her condition at that time, did Mr. Bosanka see her condition at that time?" On objection this question was not answered. Mrs. McDonald was then permitted to tell what Bosanka told her "at the time the application was made with reference to the condition of Belvia Kirk." This would be July 7, 1923, or a few days before that date.

"Redirect examination by Mr. Kavanaugh:

"Q. Mrs. McDonald, did you have any conversation with Mr. Bosanka at the time the application was made with reference to the condition of Belvia Kirk—with reference to her having had an operation? A. Yes, sir, I did.

"Q. Tell the jury what that was, all the conversation. A. Well, I told him I hadn't thought of taking a policy out, he says well let me write you up one anyway; he kept insisting, he says she is all right in every way, I says well she is going every place and seems to

be feeling all right, but she has been operated on, he said how long ago, I said nine months ago, he says well she is able to go every place and she does go every place, you know nothing is wrong with her now, he says she is apparently in good health and he says I can write up a policy on anyone like that, I can write up a policy on anyone if I see them going around like she is in good health. . . .

"Q. And then he told you as you stated to the jury what he could do? A. Yes, sir, he told me that is all right, Belvia is all right, I can write up a policy if you give me the consent to, I said well all right.

"Q. And after this conversation was had he took the application, was it? A. Yes, sir."

Since the application was dated July 7th (as stated by plaintiff's counsel on page 63 of the abstract), it is clear that the conversation with Bosanka was sometime before July 7th. It appears that all this was about three weeks or a month before the policies were delivered.

Mrs. Mattie Kirk, the mother-in-law of the insured, was the third and last witness called in rebuttal; she testified that Bosanka asked her to take out a policy on Belvia's life and she assented, and he said "then when I see Belvia I will have her sign it and I will send it off and if it is all Okey you get your policy and receipt book for which I did." She then testified as follows:

"Q. What, if anything, did he say about her condition or what did you say about her having had an operation? A. Yes, sir, I said I told him I said of course Belvia has had an operation and I said perhaps that would interfere in taking out a policy, I wouldn't want to do anything wasn't right to, he says how long has it been? I think he counted it up and said well been nine months but I will put it seven.

"Q. Did he say anything else about that? A. Well he says now I will send these papers off when I see her, when she signs them I will send them off and if all Okey they will send you the policy and receipt book.

"Q. What did you receive later? A. It wasn't but a short time until he came and says well I seen Belvia and I sent the policy (application) off and you will get it right away. Well when he came to collect again he brought me the policy and receipt book and I paid him for it and paid up to the date of her death."

This was all of the rebuttal evidence.

The two claim papers of Mrs. McDonald and Mrs. Kirk both state that the duration of last illness was five months and that insured died December 11, 1923, and that insured had been treated previous to going to Denver by Dr. Moore and Dr. Sheetz of Trenton and by Dr. Harris of Jamesport, and that she had been operated on in 1922 for tumor pus; that deceased had been at Mayo Brothers' Clinic in

Rochester, Minnesota; and that she had been in a hospital in James-port, Missouri, in October, 1922. Mrs. McDonald's claim as sister-in-law is on policies 707157276 and 277. Mrs. Mattie C. Kirk's claim as mother-in-law is on policy 707157283. As a part of the proofs, the sworn statements of Dr. Harris, Dr. Wright and Dr. Berken-mayer were submitted and they were in evidence.

The affidavit of Dr. Harris, dated February 9, 1924, and submitted as a part of the proofs, certifies that the cause of insured's death was pulmonary tuberculosis and its duration "from personal knowledge, one year," "duration from history given—none."

Dr. Wright's statement shows that he attented the insured April 30, 1921, and October 30, 1921, for pelvic infection and pus tubes and is not important since defendant is not contending that such condition caused the death.

Dr. Berkenmayer, in his sworn certificate, submitted by claimants as part of the proofs, gave as cause of death, tuberculosis, and duration "from history," two years.

Dr. Berkenmayer's deposition was taken and read in evidence by defendant; he testified that his first visit was in November, 1923; that insured was then in a very serious condition from tuberculosis of both lungs and throat and constantly got worse, and she died December 11th, from tuberculosis, and that insured could not have been in good health on July 7, 1923, that "she must have contracted it a considerable time previous to this date when I first saw her."

The deposition of Dr. Norman Keith, of Mayo Clinic of Rochester, was read in evidence. He stated that the insured was at Mayo Clinic August 21 and 22, 1923; that he examined insured; that she gave him a history of not feeling well since November, 1922, following an abdominal operation, and "from that time on she lost weight and strength and a previous cough has become much worse." Dr. Keith examined her August 22, 1923, and he found her thin, undernour-ished and weighing but eighty-two pounds, that she had extensive pulmonary involvement, confirmed by X-ray examination, rales, and tubercular bacilli in the sputum. "Q. Can you state approximately how long previously this woman had suffered from this condition? A. I should say several months. Q. In your opinion was she suf-fering from this condition on July 7th and on July 23, 1923? A. In my opinion she was. Q. In your opinion, was it impossible for her to have been in good health on July 7 or July 23, 1923, previous to your examination? A. I don't think so."

After all the evidence was in, defendant asked the court to instruct the jury that under the law and the evidence its verdict must be for the defendant upon each count of plaintiff's petition, which de-murrer was overruled and exception taken; it then asked other in-structions, some of which were given and some refused. Complaint is made of one refused instruction.

There was no instruction on the merits given for plaintiff but merely an instruction that, if the jury should find for the plaintiff, its verdict should be in a certain amount with interest from December 9, 1926 (the date the present suit was filed).

Respondent admits that the foregoing statement of facts made by appellant, is fair, complete and generally accurate and he adopts it except for certain "corrections," viz.: He says that Bosanka was the local agent and *alter ego* of defendant; that there was no deposit in court *in this case* of the premiums paid; and that appellant's statement is incorrect in stating that there was no evidence offered by plaintiff to obviate the effect of the statements contained in the proofs of loss as to insured's condition on July 23, because "the first evidence of tuberculosis and the first knowledge anybody had of such condition if it existed, was in August, 1923." Further details as to the facts touching these matters or other questions involved will be given, if necessary, in connection with our consideration of the points to which they pertain.

I. Plaintiff contends that he was entitled to a directed verdict. Contra, defendant contends that the court should have directed a verdict in its favor. We take plaintiff's contention first. He did not state to the trial court his grounds for such contention other than to say, before any evidence was offered that "we rest our case on the record and admissions in the pleadings." In his brief he assigns the following grounds: (a) The judgment in the case of Metropolitan Life Ins. Co. v. Harry A. Kirk et al. . . . is *res adjudicata;* (b) there was no deposit in the instant case of the premiums paid and no effective tender. (c) Bosanka, the *alter ego* of defendant company, waived the provisions of the policy relative to good health and disease. Of these in their order.

(a) It appears from the pleadings that after the proofs had been submitted soon after insured's death by Mrs. McDonald and Mrs. Mattie Kirk, claiming under the "facility of payment" clause of the policy, and before the appointment of Kirk as administrator or the institution of this suit, the insurer had brought a suit in equity against Kirk, Mrs. McDonald, Mrs. Kirk, and others as heirs of Belvia Kirk, the insured, to cancel the policies. The grounds on which cancellation had been sought are not stated in the pleadings. It may be inferred that it was on the ground of misrepresentation as to health in procuring the policies. It appears that the plaintiff's bill in said equity suit was dismissed by the circuit court, whether as a result of a trial or for other reason does not appear, and an appeal had been taken to the Supreme Court and was there pending when this suit was filed. Neither pleading nor evidence in the instant case reveal what became of that appeal. We know from our records and from the opinion of the Kansas City Court of Appeals in Kirk

v. Met. Life Ins. Co., 225 Mo. App. 756, 38 S. W. (2d) 519, that it was here dismissed for failure to comply with our rules. Thereafter, plaintiff herein interposed in this case a plea of *res adjudicata* because of that equity suit, which the trial court held good and directed a verdict for plaintiff herein. Defendant appealed and the Kansas City Court of Appeals reversed that judgment and remanded the cause for trial on the merits. [See opinion in 225 Mo. App. 756, 38 S. W. (2d) 519, supra.] Respondent admits that such decision is the law of the case on the facts then presented but claims that at the instant trial there was additional evidence which obviated the effect of that decision. The additional evidence consisted of an *offer to prove* by plaintiff, by his parol testimony, that Belvia Kirk died "leaving no creditors of her estate, no debts provable against said estate;" which offer the court rejected. The court, after the case had been remanded, had stricken out the plea of *res adjudicata* in plaintiff's reply,—that is we so assume. The abstract of record on this appeal merely states that *a part* of plaintiff's reply was stricken out, with no showing of *what* was stricken, and quotes what was left, which is merely a general denial of the "new matter" in defendant's answer. No exception to the court's action is shown. The pleadings upon which the instant trial was held contained no plea of *res adjudicata,* nor was there evidence introduced or offered which would show such fact. *Res adjudicata* must be pleaded and proved. [Kilpatrick v. Robert, 278 Mo. 257, 212 S. W. 884.] The issue of *res adjudicata* is not in the case.

▮ (b) Respondent's contention that there was no deposit of the premiums paid calls for a brief additional statement of the facts. Prior to filing its equity suit the insurer tendered all of the premiums which had been paid on the three policies to Mrs. McDonald and Mrs. Mattie Kirk, who had paid said premiums. The tender was refused. Upon filing said equity suit insurer deposited the full amount of said premiums in court, "for the benefit of the person or persons who may be entitled thereto." In its answer herein the defendant alleged that on July 11, 1925 (date of filing of the equity suit) it had tendered and paid into court all moneys received by it as premiums "and that said amount is still on deposit with said clerk (of the court) for the benefit of whoever may be entitled to same, and is herewith tendered *in this case.*" (Italics ours.) The case went to trial on that answer. Long before the trial, which occurred March 30, 1932, the equity suit had been finally determined in favor of the defendants therein, upon which determination said moneys belonged to defendant herein. As plaintiff says in his brief: "They (defendants in the equity suit) would have no right to claim it after final judgment in their favor. Only the insurance company could claim it." It was still in the hands of the clerk of the court and in the custody of the court, the same court in which

it had originally been deposited and in which the instant suit had been filed and was pending. Defendant's answer, tendering it *in this case* was and remained on file, and, as stated, was the answer on which the case went to trial. At the trial it was admitted that the said money was still in the hands of the clerk. No question is raised as to the correctness of the amount. The only objection offered by plaintiff to defendant's proof of the deposit was that "under the record and pleadings in this case this does not tend to prove or disprove any issue in the case; does not affect any rights or liabilities of either party hereto;" an objection that, to say the least, is vague and indefinite, calculated rather to "ambush" the court than to enlighten it as to the real ground of plaintiff's objection. The statute evidently relied upon by plaintiff, Section 5735, Revised Statutes 1929 (6 Mo. Stat. Ann., p. 4381), provides that in suits brought upon life policies "no defense based upon misrepresentation in obtaining or securing the same shall be valid, unless the defendant shall, at or before the trial, deposit in court for the benefit of the plaintiffs, the premiums received on such policies." Disregarding the vagueness of plaintiff's objection, we think that under the facts shown there was a sufficient and timely tender and deposit of the premiums.

▆ (c) Plaintiff's rebuttal evidence tended to prove that Bosanka, as defendant's agent, solicited insurance, took applications therefor, delivered the policies and collected the premiums. Let it be assumed, for the purpose of this case, that he had authority to waive the sound health provision of the policies. There was no evidence in the case that he knew or had reason to believe that Belvia Kirk had tuberculosis. Plaintiff contends and his evidence tends to show that those most closely associated with her did not then know it. If Mrs. McDonald and Mattie Kirk knew or suspected it they did not so intimate to Bosanka. They spoke only of the abdominal operation Belvia Kirk had undergone in October, 1922. Waiver necessarily implies knowledge of the matter claimed to have been waived. [Benson v. Met. Life Ins. Co., 161 Mo. App. 480, 144 S. W. 122; Reithmueller v. Fire Assn., 20 Mo. App. 246; Hodges v. Amer. Nat. Ins. Co. (Mo. App.), 6 S. W. (2d) 72, 78 (12); Wiser v. Central Business Men's Assn., 219 S. W. 102, 103 (1-3).] The evidence is insufficient to show waiver of the sound health provision as to tuberculosis. [See Benson v. Ins. Co., supra.] Even were the evidence sufficient to make an issue on that point it would not justify a directed verdict for plaintiff. The evidence on that question was oral and was offered by plaintiff. Its weight and credibility would be for the jury. The court did not err in refusing to direct a verdict for plaintiff.

▆ II. Defendant's contention that a verdict should have been directed in its favor requires first a consideration of the admissibility

and binding effect as against him of the proofs of death. Proofs of death furnished by a beneficiary are admissible against such beneficiary to show the truth of the statements contained therein in an action brought by him on the policy, and when not contradicted or explained may preclude recovery. [Burgess v. Pan-American Life Ins. Co. (Mo.), 230 S. W. 315, and cases cited.] Such statements are prima facie only, and are not to be treated as conclusive when other facts are brought forward to explain or contradict them so as to relieve against the effect of such admission. But when not so explained, or contradicted, the statements against interest, if sufficient to defeat recovery under the law, are treated as true and given effect accordingly. [Stephens v. Met. Life Ins. Co., 190 Mo. App. 673, 176 S. W. 253. See, also, Cope v. Central States Life Ins. Co. (Mo. App.), 56 S. W. (2d) 602, 605; Smiley v. John Hancock Mut. Life Ins. Co. (Mo. App.), 52 S. W. (2d) 12, 14; Grohmann v. The Maccabees (Mo. App.), 237 S. W. 875; Burgess v. Ins. Co., supra.] We do not understand plaintiff to dispute that such is the law, but he says it does not apply in this case because he did not make and furnish the proofs of death.

The proofs in question were made and submitted to defendant shortly after insured's death by Mrs. McDonald and Mattie Kirk, who were claiming and seeking payment under the "facility of payment" clause of the policies. Defendant refused payment. It does not clearly appear on what ground payment was refused, since defendant, though having the right to pay to relatives, was not obliged under the terms of the policy to pay to other than an administrator or executor. [Manning v. Prudential Ins. Co., 202 Mo. App. 124, 213 S. W. 897.] It inferentially appears from defendant's answer, however, that the refusal was on the ground that the proofs submitted showed misrepresentations in the application as to insured's health and breach of the sound health provision in the policies. The equity suit against the heirs for cancellation was then brought by the insurance company. Later plaintiff was appointed administrator and brought this suit. It is clear from the whole record that he did not make and submit any proofs of death himself and that none were submitted save those here involved, submitted by Mrs. McDonald and Mattie Kirk. In the petition herein, after alleging the issuance of the policies, the death of the insured and that the policies were in force at her death, he alleged, "That after the death of said Belvia Kirk, due notice thereof was given to defendant, its agents and servants, and proper and due proof of death was made and furnished to defendant; that all the provisions and conditions of said policy with reference to proof of death were complied with." There is a further allegation that insured died on December 11, 1923; that at the time of her death all premiums had been paid "and that all provisions and conditions of said policy were com-

plied with *by plaintiff;* that on December 13th, due notice and proof of death was furnished defendant and said policy aforesaid was delivered to defendant and demand for payment . . . was then and there made'' (italics ours); and that defendant denied liability, brought a suit to cancel the policy (not stating the grounds thereof), and refused and still refuses to pay.

Defendant contends that by his pleading and the theory or ground of recovery thus presented plaintiff adopted as his own and became bound by the proofs of death therein referred to. Respondent says that defendant's denial of liability because of alleged misrepresentation and breach of the sound health provision and its attempt to cancel the policies waived the furnishing of proofs of death; that he was not required to plead or prove that they were furnished, wherefore that part of his petition was not necessary to his cause of action, and was in effect surplusage; that it did not bind him as by adoption of said proofs; and that as he did not make or submit said proofs and did not offer them in evidence he is not in any event bound by the statments therein contained. The proofs were introduced in evidence by defendant over plaintiff's objection.

We agree with defendant's contention. The proofs of death introduced were not dated December 13th, but a month or so afterward. But, as stated above, it clearly appears from the record that those were the proofs referred to in the petition and the only proofs that had been submitted. Plaintiff made no suggestion to the contrary at the trial, but objected to their introduction on other grounds. The policy calls for proofs of death as a condition precedent to the right to demand payment. Assuming for the purpose of this case, without deciding, that, in view of defendant's denial of liability, plaintiff might have treated the requirement to furnish proofs of death as waived and might have stated a cause of action without pleading compliance with that provision of the policy, he did not see fit to do so. He chose to strengthen his case by adopting and securing the benefit of the proofs which had been submitted, and perhaps thereby forestalling a possible claim by defendant of noncompliance with that requirement. We think there is no doubt that he had the right to adopt and avail himself of such proofs. They had been made and submitted by persons in interest, to whom the company had a right to make payment and they were accepted by the company.

No case from this jurisdiction decisive of this point is cited nor have we found any, though in Cope v. Central States Life Ins. Co., supra, it was held that proofs furnished to one insurer were admissible against the same beneficiary in an action brought by him against another insurer. But a similar question has been before the courts of New York and Wisconsin.

In Strang v. Prudential Ins. Co. of America, 263 N. Y. 71, 188 N. E. 161, the plaintiff in his individual capacity had made and

submitted proofs of death. Payment was refused. Later plaintiff was appointed administrator and in that capacity sued. The company denied liability on the ground of fraud in procurement of the policy and breach of the sound health provision. The defendant also pleaded that the *plaintiff* had not made proofs of death. The petition alleged, as here, that "due proof of death . . . was duly furnished to the defendant." The proofs were introduced in evidence by the defendant. It was held that the plaintiff, in his capacity of administrator had adopted the proofs which he had furnished when seeking payment as husband under the facility of payment clause of the policy and was bound by the statements therein. However, the question of waiver of proofs of death by the defendant and the effect thereof, if any, in relieving the plaintiff from the consequences of having by his pleading adopted proofs made by others is not considered in the opinion. [See, also, to same effect Vecchio v. Met. Life Ins. Co., 230 N. Y. Supp. 131; Cirrincioni v. Met. Life Ins. Co., 228 N. Y. Supp. 354.]

In Fey v. I. O. O. F. Mut. Life Ins. Co., 120 Wis. 358, 98 N. W. 206, it was held that proofs of death made by one of several beneficiaries (not a plaintiff) made on behalf of all the beneficiaries and where the rights of all were dependent upon the fact that such proofs had been made, were admissible against all, though those suing had made no separate and independent proofs and relied on the proofs of the one who had furnished them.

While, as respondent argues, the above cases are not precisely like in their facts to this, in that the question of waiver of proofs of death by the defendant and consequent absence of necessity for compliance by the plaintiff with that provision of the policy is not considered, still we think the principle involved applies. Here the proofs were furnished before there had been any waiver by defendant, by persons in interest having a right to furnish them and thus in behalf of all beneficiaries (Fey v. Ins. Co., supra), comply with the terms of the policies. Plaintiff had a right to adopt them as his own and avail himself of any benefit accruing from the fact that they had been furnished. He voluntarily did so and we think he should be held thereby to have made them his own.

 III. This brings us to the question of whether or not there is any evidence to explain or contradict the statements contained in the proofs and thus obviate their otherwise conclusive effect. We are of the opinion there is not. We have set out above the testimony of the three witnesses relied upon by plaintiff as furnishing such evidence. We do not understand respondent to dispute the fairness or accuracy of such statement of the evidence. His contention seems to be that lack of knowledge that insured had tuberculosis on the part of those with whom she associated and her, to them, ap-

parent freedom from such disease, is sufficient, notwithstanding the statements in the proofs of death, to authorize a finding by the jury that she did not have the disease.

The testimony of the plaintiff, husband of the deceased, shows only that he did not know that his wife had tuberculosis until he took her to Mayo's which was approximately a month after the date of the policies, and that so far as he knew she had not previously been treated for that disease. Of the testimony of Mrs. McDonald and Mattie Kirk respondent says in his brief that "such evidence is not directed to a showing that insured did or did not have tuberculosis but rather to proof of waiver of the good health provision of the policies by the *alter ego* of the company. It seemed to be assumed by counsel for both sides, as indicated by the examination and cross-examination of these two ladies that they had no knowledge of the existence of tuberculosis, sixteen days before the date of the policies. The presumption would be that such state continued until some change was evident." Let it be assumed,—and it may be inferred from their testimony,—that these ladies had no knowledge of the existence of tuberculosis on July 7. It does not follow from such lack of knowledge on the part of these lay witnesses that the disease did not exist even at that time, and they did not testify as to insured's condition or appearance or as to their knowledge of her condition on July 23. In their affidavits submitted as parts of the proofs of loss they said insured's last illness, tuberculosis, had existed for five months prior to her death, which would be from July 11. Their testimony does not explain or contradict that statement. There is no evidence in the case as to whether or not the existence of the disease in its earlier stages would produce symptoms observable and recognizable by a lay witness merely from observation of the afflicted person. Under the facts and circumstances shown the presumption suggested by respondent cannot be indulged.

In Rush v. Met. Life Ins. Co. (Mo. App.), 63 S. W. (2d) 453, cited by respondent, it is said that testimony for plaintiff contradictory of the admissions against interest in the proofs of death is not without probative value because given by lay witnesses. Similar expressions are found in Bruck v. John Hancock Mut. Life Ins. Co., 194 Mo. App. 529, 185 S. W. 753, and Smiley v. John Hancock Mut. Life Ins. Co., supra, also relied on by respondent. In the Rush and Bruck cases there were facts and circumstances tending to contradict the admissions in the proofs of death other than mere lack of knowledge on the part of the insured's relatives or associates that he had the disease in question. In King v. Met. Life Ins. Co. (Mo. App.), 211 S. W. 721, the claimant denied that she had made the admissions attributed to her in the proofs, and the question was held to be for the jury. In the Smiley case, however, the plaintiff testified in substance that her husband (the insured), had worked

every day around the time he took out the policy; that while he took some medicine prescribed by the doctor, he was not on a diet, did not sleep out doors, did not lose weight or have night sweats; that she did not notice any impairment in his health and she thought he was getting along all right because he looked well up to the time of his death; and that the doctors had never told her anything to the contrary. The court held that such testimony did not explain, controvert or rebut the force of the admissions, based upon professional diagnoses, that the insured was suffering from tuberculosis when he took out the policy. [See, also, Mudd v. John Hancock Mut. Life Ins. Co. (Mo. App.), 39 S. W. (2d) 450; Clark v. National Life & Acc. Ins. Co. (Mo. App.), 288 S. W. 944.] In the instant case the testimony of plaintiff and his other witnesses is not inconsistent with or contradictory of the admissions in the proofs of death that the insured had tuberculosis at the time the policies were issued. It is conceded that she died of that disease. We are constrained to hold that plaintiff failed to explain, controvert or rebut those admissions.

■ IV. In view of our holding that the statements in the proofs of death were binding on plaintiff, and, not being explained or contradicted, became conclusive against him, we must consider another question, in determining defendant's right to a directed verdict,—viz.—was it necessary that it should appear not only that the insured in fact had tuberculosis and died therefrom but also that she knew she had the disease or from all the facts and circumstances must be presumed so to have known. The Court of Appeals, as we understand its opinion, in effect so held. It in effect held the rule to be that "false representations will not void a policy unless assured knew they were false or unless they are concerning matters of which the assured must be charged with knowledge." [72 S. W. (2d) l. c. 191.] And because it deemed its decision on that point in conflict with Ryan v. Natl. Counsel of the Knights and Ladies of Security, supra, it certified the case to this court. The decision also overrules Clark v. Natl. Life & Acc. Ins. Co. (Mo. App.), 288 S. W. 944; Hammers v. Natl. Life & Acc. Ins. Co. (Mo. App.), 292 S. W. 1064; Hodges v. Amer. Natl. Ins. Co. (Mo. App.), 6 S. W. (2d) 72, and Gallop v. Royal Neighbors of Amer., 167 Mo. App. 85, 150 S. W. 1118, by the same court, all of which cases hold that if the representation is in fact false, whether fraudulently or innocently made by the insured, and the fact misrepresented caused or contributed to the death of the insured, the defendant is not liable where the policy contains a condition such as in this case. In the instant case, while, as we have held, it conclusively appears that the insured had tuberculosis at the date of the policies and concededly died from that disease, we think an inference might properly be

drawn from the evidence that she did not know she was so afflicted when she signed the applications or when the policies were issued and that a jury could legitimately so find. It becomes material, therefore, to determine whether lack of knowledge, actual or presumptive, on her part, of her disease, when she procured and accepted the policies, containing as they did the sound health provision, avoids the defense tendered.

With the highest respect for the learned Court of Appeals we cannot agree with the conclusion it reached. It should be stated in justice to that court that it based its decision on certain language of this court in State ex rel. Met. Life Ins. Co. v. Allen, 310 Mo. 378, 276 S. W. 877, which seemed to it to point to the conclusion reached. We shall notice the Allen case presently.

In Salts v. Prudential Ins. Co., 140 Mo. App. 142, 120 S. W. 714, it was held that our misrepresentation statute, Section 5732, Revised Statutes 1929 (6 Mo. Stat. Ann., p. 4373), applies to sound health provisions in the policy itself, such as that here involved, as well as to misrepresentations made in *obtaining* the policy. Both parties treat that holding as a correct application of the statute, wherefore without discussion we shall so treat it for the purpose of the case. In Kern v. Supreme Council, Amer. Legion of Honor, 167 Mo. 471, 487, 67 S. W. 252, this court said: "The statute draws no distinction between innocent and fraudulent misrepresentations, and the courts have no right to draw any such distinction." That ruling was cited with approval in Burgess v. Pan-American Life Ins. Co. (Mo.), 230 S. W. 315, 322, a case involving a sound health provision in the policy. It has been frequently followed by our Courts of Appeals.

State ex rel. v. Allen, supra, was a certiorari proceeding to quash the opinion of the St. Louis Court of Appeals in Simpson v. Met. Life Ins. Co., 263 S. W. 521, holding that an answer filed in a suit on an insurance policy which pleaded misrepresentations was defective because it alleged only that the misrepresentations were untrue and did not allege that they were willfully and knowingly made for a fraudulent or corrupt motive by the insured. The suit in the Simpson case was based upon a policy which provided that: "All statements made by the insured shall, in the absence of fraud, be deemed representations, and not warranties, and no such statement shall avoid this policy or be used in defense of a claim hereunder, unless it is contained in the written application therefor and a copy of such application is securely attached to this policy when issued." [263 S. W. l. c. 522.] The Court of Appeals held that the policy itself thus made a distinction between innocent and fraudulent misrepresentations, and that the answer did not sufficiently plead fraud.

On certiorari, in State ex rel. v. Allen, supra, this court was concerned only with the question of alleged conflict between the Court

of Appeals' decision and prior decisions of this court and was dealing with the sufficiency of the answer to plead fraud. In discussing that question it held the answer sufficient, saying that it contained all the essential averments necessary to a defensive plea of fraud and that it is not necessary to use the term fraud if facts are averred which show it to be a conclusion of law. Then follows the language (310 Mo. l. c. 383, 276 S. W. 877), which, we think, misled the Court of Appeals in this case: "Whether, therefore, the false statements of the insured be regarded as an actual fraud, made with the intention of deceiving the medical examiner; or a legal fraud, which consists of a misstatement of a matter within the personal knowledge of the insured or of such a character that the insurer must have regarded it as within the personal knowledge of the former, it constitutes, whether it be one or the other, such a false representation as should be held to avoid the policy."

Further on in the opinion the court said (310 Mo. l. c. 384-5, 276 S. W. 877): "In the presence of fraud in the procurement of this policy the distinctive differences between representations and warranties as defined in the contract between the insured and the company need not concern us. However, the false statements being material and having been incorporated into the written application for the policy, they may be classified as warranties, to the extent, at least, that the insured warranted them to be true as a necessary condition to the procuring of the policy." [Citing: Pac. Mut. Ins. Co. v. Glaser, 245 Mo. 377, 150 S. W. 549, and Carter v. Met. Ins. Co., 275 Mo. 84, 204 S. W. 399.] The Glaser case was a suit in equity brought by the insurer against the insured, to cancel the policy because of a false representation made in the application and relied upon by the insurer in issuing the policy. The court held the case was not governed by the misrepresentation statute, and said, 245 Mo. l. c. 387, quoting from 3 Cooley's Briefs on Law of Insurance, page 1935, in substance that according to the general rule stipulations contained in a policy are warranties and, page 1954: "It is, however, well settled that a breach of warranty is fatal to the policy, though the insured had no knowledge of the falsity constituting the breach, and did not intend to deceive the insurer."

In State ex rel. v. Allen, supra, the court mentions but does not criticize the Kern case. Had it meant to overrule it, it would certainly have said so and doubtless would have transferred the cause to the court en banc, because the Kern case was decided by Division One and State ex rel. v. Allen, by Division Two. We are satisfied the court did not so intend and further that the decision, rightly understood and having in mind the question for decision therein, is not in conflict with the Kern case. We think also that the Kern case correctly construes the statute as making no distinction between innocent and fraudulent misrepresentations, especially when the stat-

ute is applied to a sound health condition in the policy itself such as in the instant case. That stipulation is a part of the contract which the parties had a right to and did make. The insurer agreed to assume liability only upon condition that the insured should *be*, not merely believe herself to be, in sound health when the policy was issued, and the premium was fixed upon that basis. Had the insurer known that the applicant for insurance was afflicted with a disease that probably would, as it did, soon cause her death, it doubtless would not have issued the policy. To hold in such a case that the statute makes immaterial and ineffectual a misrepresentation relied upon by the insurer, even though the matter misrepresented actually contributed to the event on which the policy is to become payable, unless the insured knew or in the opinion of the court or jury should be presumed to have known that the representation so made and relied upon and stipulated in the policy as a condition upon which the risk was assumed was false, would be to read into the statute by construction something its language does not say and to impose upon the insurer a risk it did not agree to assume and by the express terms of the contract declined to assume.

The misrepresentation statute, Section 5732, supra, provides that the question of whether the matter misrepresented contributed to the event on which the policy is to become payable shall be a question for the jury. Yet the power remains in the court to determine whether there is any evidence which authorizes submission of the case to the jury. [State ex rel. John Hancock Mut. Life Ins. Co. v. Allen, 313 Mo. 384, 399, 282 S. W. 46, 50.] We are of opinion that in this case the evidence did not justify submission of the case to the jury and that defendant's request for a directed verdict in its favor should have been granted. The judgment of the circuit court is reversed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.